KEKER, VAN NEST & PETERS LLP
NICHOLAS D. MARAIS - # 277846
nmarais@keker.com
CODY GRAY - # 310525
cgray@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendant
ROBERT BROWN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBERT BROWN,<br><br>    Defendant. | Case No. 4:24-cr-00024-AMO<br><br>**DEFENDANT ROBERT BROWN'S SENTENCING MEMORANDUM**<br><br>Date:       July 8, 2024<br>Time:      2:00 p.m.<br>Dept.:      Courtroom 10 – 19th Floor<br>Judge:     Hon. Araceli Martínez-Olguín<br><br>Date Filed: June 6, 2023 |

2730994

## I.    INTRODUCTION

On March 18, 2024, Defendant Robert Brown pled guilty to two counts—one for being a felon in possession of ammunition and one for possession with intent to distribute methamphetamine.[1] Under Rule 11(c)(1)(C), the parties have agreed to a sentence of 84 months in custody, followed by five years of supervised release, and a mandatory special assessment of $200. That sentence is slightly but not significantly different from what the Probation Office has now proposed: although Robert's agreement means that he will spend slightly *less* time in custody than the PSR recommends, it also means that he will spend an additional *two years* in supervised release.[2] In total, Robert's agreement means that he will not finish his supervised-release term until 2034, almost a full year later than the Probation Office has recommended.

As the PSR makes clear, Robert has struggled with addiction for more than three decades. He started using alcohol, marijuana, and methamphetamine at age 12, and soon moved on to cocaine, crack, heroin, and prescription drugs. The PSR notes that Robert "began using methamphetamine at age 12"—that is, in 1990—and "used it 'all the time' until his arrest in the instant offense"—that is, in 2023. Robert needs, and is ready, to focus on his rehabilitation and sobriety and, when he finishes his custodial term, to work on reintegrating into society in a meaningful and productive way. He is focused on his family and his girlfriend, with whom he has been in a relationship for the past few years, and on making his *and* their lives better. And he recognizes that it is time for him to do so: Although Robert is a "career offender" under the Guidelines, he is now in his mid-40s. If the Court accepts his plea deal and sentences him as the parties have proposed, Robert will be 50 before he is released from custody and in his mid-50s by the time he completes his supervised release. He is ready to put his past behind him, to commit to sobriety, and to make the most of the years he has left.

Robert respectfully submits that the agreed sentence is sufficiently serious to serve as both

---

[1] Specifically, Robert pled guilty to possession with intent to distribute less than 5 grams of methamphetamine or less than 50 grams of a mixture or substance containing a detectable amount of methamphetamine. *See* 18 U.S.C. §§ 841(a)(1), (b)(1)(C).

[2] The Probation Office has proposed a 100-month custodial sentence (as opposed to the agreed 84 months) followed by 36 months of supervised release (as opposed to the agreed 60 months). Under his "C" plea, Robert will be in custody or under supervised release for a total of 12 years, almost a year longer than the PSR proposes.

1

DEFENDANT ROBERT BROWN'S SENTENCING MEMORANDUM
Case No. 4:24-cr-00024-AMO

2730994

punishment and deterrent—and that it will adequately serve the goals of sentencing.

## II.    FACTUAL BACKGROUND

### A.    Robert's Personal History

Robert was born in Walnut Creek and has spent his entire life in the Bay Area. He grew up in Bay Point, where he and his sisters, Sheila and Rhonda, were raised by his mother.

Robert's childhood was difficult. He had little contact with his biological father. When he was just five years old, his mother embarked on a relationship with a new man, an alcoholic who went on to abuse both Robert and his mother. The PSR provides more detail about the ongoing abuse in Robert's early childhood years, but suffice to say, the situation was so bad that Robert was too scared to talk to anyone about it.[3]

As Robert approached his teenage years, things went from bad to worse. At 12, his maternal grandmother, with whom Robert was very close, passed away. That same year, Robert was hit by a car and hospitalized for months—at first, immobilized in a full-body cast, and later, forced to learn to walk all over again. It was around this time that Robert's friends introduced him to drugs, which, unfortunately, have been a scourge throughout Robert's life. He first started abusing marijuana and alcohol before he turned 13, and went on to use them "all the time" during his teenage years. Soon, he added methamphetamines to the mix, and by his late teens and early 20s, Robert was in the grips of cocaine, crack, heroin, barbiturates, hallucinogens, and other prescription drugs.[4] Robert's repeated drug use during these formative years undoubtedly impacted his cognitive development, a situation worsened by dyslexia, and Robert left high school before graduating. *See* PSR, ¶ 70. Robert has ultimately remained addicted to a combination of these substances throughout his adult life, although he has been sober since he was taken into custody last year.

When Robert was 16, he was robbed and shot, setting him back yet again and requiring—again—that he spend months in hospital. As the PSR notes, that shooting caused nerve damage,

---

[3] The PSR sets out additional detail about this abuse, including its frequency and nature. *See* PSR, ¶ 60.

[4] *Id.* at ¶ 68 (noting that Robert continued to use cocaine and methamphetamines regularly until his arrest last year).

DEFENDANT ROBERT BROWN'S SENTENCING MEMORANDUM
Case No. 4:24-cr-00024-AMO

2730994

left Robert "scared of going outside," and left him with permanent physical damage that persists to this day. *See* PSR, ¶ 65 (noting that, as a result of the shooting, Robert "walks with a limp, which makes it difficult to walk long distances.").

It is difficult to overstate the impact that Robert's childhood has had on his adult life. The PSR notes briefly that Robert completed the Adverse Childhood Experiences (or "ACEs") test, which "evaluates traumatic events involving abuse, neglect, and household dysfunction that occur during childhood…." *Id.* at ¶ 67. The ACEs categories measure things like emotional abuse, physical abuse, sexual abuse, and so on. Studies have demonstrated that these scores can be correlated to long-term physical and psychological issues. For instance, in one study, individuals who scored 4 or more on the ACEs test had a 1,220% increase in suicide attempts, while men who score 6 or more had a 4,600% increase in their likelihood of using intravenous drugs in adult life.[5] Robert's ACEs score was **9**. PSR, ¶ 67.

Despite these significant challenges, Robert has had periods of success. He obtained his high school diploma while incarcerated. He was a member of an ironworkers' union. And, most recently, he worked for three or four years doing day jobs for a drywall company—work he felt good at and found rewarding—until he was laid off because the company was struggling in 2022.

### B.    Robert's 2022 and 2023 Arrests

Unemployed and hounded by addiction, Robert unfortunately returned to selling drugs. In August 2022, he was apprehended by two Antioch Police Department ("APD") officers—including Officer Arturo Becerra[6]—who pursued him after alleged traffic violations. The APD

---

[5] Vincent Felitti, *The Relation Between Adverse Childhood Experiences and Adult Health: Turning Gold into Lead*, The Permanente Journal, 6(1), 44–47, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6220625/.

[6] This Court is familiar with Officer Becerra as one of the officers whose conduct was at issue in *Quinto-Collins, et al. v. City of Antioch, et al.*, Case No. 21-cv-06094-AMO. In addition, both Officer Becerra—whose arrest of Mr. Brown in August 2022 led to the initial search described in the PSR, and, by extension, to the two subsequent searches—and Supervising Officer Loren Bledsoe—who supervised and signed off on the August 2022 arrest report—have previously been identified in connection with the Contra Costa County District Attorney's March 2023 investigation into racist and offensive text messages exchanged by and among officers in the Antioch Police Department. *See, e.g.*, Investigation Report, available at http://antiochherald.com/wp-content/uploads/2023/04/CCCDAO-Report-Court-Ordered-Redactions-041323.pdf; *see also* Antioch Herald, *Redacted Version of DA's Report on Antioch Police Officers' Racist, Offensive Texts Leaked*, available at https://antiochherald.com/2023/04/redacted-version-of-das-report-on-antioch-police-officers-

2730994

officers detained Robert at the scene. When Contra Costa County Sheriff's Office ("CCCSO") deputies arrived on the scene, they searched Robert's vehicle and found drugs, guns, ammunition and cash. According to the plea agreement and the PSR, the CCCSO officers subsequently conducted two other searches—one of Robert's workshop in December 2022 and another of his vehicle in June 2023—which led to the seizure of other drugs, guns, and cash. Robert was arrested on June 8, 2023 and taken into custody, where he has remained ever since.

### C.    Procedural History

On June 6, 2023, the government filed a complaint charging Robert with one count of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1).

Robert made his initial appearance on June 9, 2023, at which time Chief Magistrate Judge Donna Ryu appointed the Federal Public Defender to represent him.[7]

On January 19, 2024, the government filed an Information, which added a second count for possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine, in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(C).

Robert waived indictment on January 19, 2024, and pled guilty before this Court—pursuant to a "C" plea—on March 18, 2024. *See* Dkt. 38. In doing so, he has taken responsibility for his actions (indeed, both the government and the Probation Office have recommended a three-level reduction for acceptance of responsibility).

He is scheduled to be sentenced by this Court on July 8, 2024.

## III.    PLEA AGREEMENT

Robert entered into a plea agreement under Rule 11(c)(1)(C). *See* Dkt. 37. The parties agreed to a sentence of 84 months in custody, to be followed by five years of supervised release, and a mandatory $200 special assessment ($100 per count). Robert has agreed to forfeit the drugs, guns, ammunition, and cash seized during the 2022 and 2023 searches.

---

racist-offensive-texts-leaked/. Suffice to say, the government's case against Robert is not without its own issues and—as the government acknowledges in its sentencing memorandum—litigating this case would "likely" have entailed "substantial motions practice…." *See* Dkt. 47 at 4.

[7] Assistant Federal Public Defender John-Paul Reichmuth represented Robert until April 2024, when he identified a conflict and undersigned counsel was appointed in his stead.

4

DEFENDANT ROBERT BROWN'S SENTENCING MEMORANDUM
Case No. 4:24-cr-00024-AMO

2730994

## IV.    U.S. SENTENCING GUIDELINES

Robert agrees with the Guidelines calculation set forth in the plea agreement and the PSR:[8]

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2D1.1(a)(5), (c)(6) | 30 |
| Specific Offense Characteristics under U.S.S.G., § 2D1.1(b)(2) | +2 |
| Acceptance of Responsibility, U.S.S.G. § 3E1.1: | - 3 |
| Total Offense Level: | =    29 |

Robert agrees that his prior convictions result in a criminal history score of 12, which would yield a criminal history category of V, but that, because he is a career offender under U.S.S.G. § 4B1.1(b), his criminal history category is boosted to VI. As a result, his Guidelines range is 151–188 months. *See* U.S.S.G. § 5G1.1(c)(2). Neither of the offenses to which Robert has pled guilty has a mandatory-minimum sentence. *See* 18 U.S.C. § 924(a)(2), 21 U.S.C. § 841(b)(1)(A).

## V.    SENTENCING RECOMMENDATION

### A.    Legal Standard

As the Court knows, the Sentencing Guidelines "are only advisory." *United States v. Carty*, 520 F.3d 984, 990 (9th Cir. 2008). Sentencing must begin "by determining the applicable Guidelines range," but "[t]he district court may not presume that the Guidelines range is reasonable." *Id.* at 991. Nor may the Guidelines "be given more or less weight than any other" factor: they "are to be respectfully considered," but they are only "one factor" among many to be taken into account in arriving at an appropriate sentence. *Id.*

After determining the Guidelines range, courts turn to the § 3553(a) factors. These include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.*; 18 U.S.C. § 3553(a)(1)–(2). The sentencing judge should

---

[8] *See* Dkts. 37 (plea agreement), 46 (PSR), ¶¶ 3, 31.

"consider every convicted person as an individual and every case as a unique study." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). This methodology reflects the bedrock principle that the punishment should suit "not merely the offense but the individual defendant." *Id.* at 488 (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

### B.    A custodial term of 84 months is sufficient to serve the purposes of the sentencing statute.

Here, both Robert and the United States Attorney's Office agree that a custodial sentence of 84 months is appropriate. Although this seven-year sentence is slightly—approximately one year—less than the PSR's recommendation of 100 months, there are good reasons for that, and several of the § 3553(a) factors suggest that anything more than 84 months would be "greater than necessary" to serve the goals of sentencing.

*First*, as the PSR recognizes, there are "many mitigating factors" in this case and Robert deserves "sympathy" for the "struggles" he has encountered throughout his life. *See* PSR, Sentencing Recommendation, 2–3. Among other things, Robert "has a history of childhood trauma, including physical and sexual abuse and being severely injured in both a car accident and a shooting. He has a history of depression and substance abuse, neither of which have been adequately treated." *Id.* In particular, Robert has struggled with drug addiction his entire life, beginning with marijuana at age 12 and moving on to alcohol, cocaine and methamphetamines soon thereafter. While these circumstances and addictions do not justify Robert's decisions, they certainly help explain them—and ultimately counsel in favor of a sentence that prioritizes Robert's recovery, rehabilitation, and reintegration into society. In many ways, that recovery is more likely to be achieved via a slightly shorter period of incarceration balanced by a longer period of supervised release, which is exactly what Robert and the prosecution are proposing. Indeed, the parties' agreement (84 months of custody followed by 60 months of supervised release) would have Mr. Brown under the government's observation and this Court's supervision for longer, in total, than would the PSR's proposal (100 months of custody followed by 36 months of supervised release). Mr. Brown is committed to staying sober. He is eager to

6

2730994

participate in the RDAP program while in custody, as the Probation Office has recommended, and in an "outpatient program of testing and treatment for drug abuse, as directed by the probation officer…." *See* PSR, Sentencing Recommendation, ¶ 2. But he respectfully submits that 84 months in custody is an adequate sentence—that will serve as punishment and allow Robert to get his life back on track—while not being "greater than necessary" to accomplish these goals.

*Second*, deterrence neither requires nor justifies a greater sentence in this case. As a general matter, the available data does not support the conclusion that longer sentences promote general deterrence.[9] As the DOJ's National Institute of Justice has explained, "the chance of being caught is a vastly more effective deterrent than even draconian punishment."[10]

And a seven-year sentence—especially when coupled with five years of supervised release—will be sufficient to dissuade Robert from engaging in further criminal conduct, particularly if he participates successfully in drug rehabilitation programs, which he desperately needs. Although Robert has had several serious sentences in the past, they were almost all in his 20s and 30s. Robert is now 45, which means that he will be at least 50 by the time he completes an 84-month sentence and in his mid-50s by the time he finishes his term of supervised release. There is no doubt that, as the U.S. Sentencing Commission has observed, age has "a strong influence on recidivism. … For offenders in Criminal History Category VI, the rearrest rate ranged from 89.7 percent for offenders younger than age 30 at the time of release to 37.7 percent for offenders age 60 or older."[11] When offenders are in their teens or 20s, as Robert was for many of his prior offenses, they have a far-higher recidivism rate (almost 65%) *and* a far shorter time to rearrest (17 months). But for offenders in their 50s, as Robert will be by the time he finishes this

---

[9] *See, e.g.,* Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where Do We Stand?* FEDERAL PROBATION 80 (3), 33–38 (Dec. 2016) ("Severity of punishment was once thought to deliver the main deterrent effect; the more severe the consequence for law-breaking, the less likely an individual is to commit a crime. However, this assumption has not been supported in the literature.").

[10] National Institute of Justice, *Five Things About Deterrence*, available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

[11] *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

DEFENDANT ROBERT BROWN'S SENTENCING MEMORANDUM
Case No. 4:24-cr-00024-AMO

2730994

sentence, the recidivism rate drops by more than half (to 27%). And, even for those who do re-offend, the time from release to rearrest is longer (25 months) and the subsequent crimes tend to be non-violent.

Robert is now significantly older than he was when he committed many of his prior offenses. He is worried about his mother's health, committed to his girlfriend and her children, and focused on putting his past behind him. As the PSR put it:

> Mr. Brown enjoys reading, exercising, fishing, riding his bicycle, roller skating, flying kites, and spending time with his girlfriend and family. He hopes to be released soon so he can help care for his mother, who has numerous health problems and is struggling with decreased mobility. He also wants to help provide for his girlfriend and her children. Mr. Brown is also interested in learning a trade or starting his own business.[12]

Robert recognizes that his prior and current offenses are serious; he has accepted responsibility for his actions and understands that, if this Court accepts this agreement, he will have to spend another significant period in prison. He also recognizes the harm he has caused to his family and his community. What he wants now is to find a way to put his past behind him, to maintain his sobriety, and ultimately, to settle down. He submits that an 84-month custodial sentence is an adequate punishment and deterrence, for him and others, and that additional time would be more than is necessary to achieve the goals of sentencing.

### C.    A five-year term of supervised release is sufficient to serve the purposes of the sentencing statute.

Robert's guilty plea subjects him to a period of supervised release between 3 and 5 years, which are the minimum and maximum terms for Count 2.[13] As part of his plea agreement, Robert has agreed to a sentence that includes five years of supervised release. This is the maximum possible period of supervised release—and significantly more than the 36 months recommended by the Probation Office. And when he is on supervised release, Robert understands that he will be closely monitored. Indeed, as part of his plea agreement, Robert has agreed to an expanded search

---

[12] PSR, ¶ 63.

[13] For Count 1, which is a Class C Felony, the Guidelines range for a term of supervised release is 1 to 3 years. Multiple terms of supervised release must run concurrently. *See* PSR, ¶ 78.

condition that will require him to "submit his person, residence, office, vehicle, electronic devices and their data" and any other "property under [his] control" to a search by the Probation Office or "any federal, state, or local law enforcement officer at any time, with or without suspicion."

### D.    The Court should waive the fine.

Since his arrest, Robert has been represented by an Assistant Federal Public Defender and, more recently, an appointed CJA attorney. He joins the PSR's request that the Court waive any fine.[14] Robert will pay the $200 mandatory special assessment as quickly as he can.

## VI.    CONCLUSION

Robert has faced tremendous challenges and debilitating addiction his entire life. He has accepted responsibility for these offenses, pled guilty, and understands that he will spend a significant time in prison. He intends to continue working on his sobriety, repay his debt to society, and, in time, reintegrate into the community in a productive way.

For these reasons, he asks that the Court accept his Rule 11(c)(1)(C) plea agreement; that it sentence him to 84 months in custody, followed by five years of supervised release; that it recommend that he participate in RDAP while he is in BOP custody; that it order him to pay the mandatory $200 special assessment; and that it waive the fine in light of his inability to pay it.

Dated:  July 1, 2024                                       KEKER, VAN NEST & PETERS LLP

                                                By:    /s/ Nicholas D. Marais
                                                       NICHOLAS D. MARAIS
                                                       CODY GRAY

                                                       Attorneys for Defendant
                                                       ROBERT BROWN

---

[14] *See generally* Dkt. 6 (CJA-23); PSR, ¶¶ 72–73 ("Mr. Brown is unemployed and incarcerated. … [He] has no assets and is represented by court-appointed counsel. It does not appear he has the ability to pay a fine."); *id.* at Sentencing Recommendation, 2–3 (recommending that the fine by waived due to lack of assets).

9

2730994